IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 13, 2015

**STATE OF TENNESSEE v. JOHN WESLEY COUCH**

**Appeal from the Circuit Court for Bedford County
No. 17739    Franklin Lee Russell, Judge**

———————————————

**No. M2014-01372-CCA-R3-CD – Filed July 24, 2015**

———————————————

The Defendant, John Wesley Couch, was found guilty by a Bedford County Circuit Court jury of promotion of methamphetamine manufacture, a Class D felony. *See* T.C.A. § 39-17-433 (2014). The trial court sentenced the Defendant as a Range I, standard offender to four years' confinement, to be served consecutively to a Coffee County sentence and any other existing sentences. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) his sentence is excessive and contrary to law. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Donna Orr Hargrove, District Public Defender; and Michael Jonathan Collins, Assistant Public Defender, for the appellant, John Wesley Couch.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Robert J. Carter, District Attorney General; Richard Aron Cawley and Michael D. Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the purchase of a box of pseudoephedrine from a CVS pharmacy on March 14, 2013. At the trial, Shane George, a Shelbyville police officer assigned to the 17th Judicial District Drug Task Force, testified that pseudoephedrine was required to manufacture methamphetamine. He said people manufacturing methamphetamine commonly obtained pseudoephedrine pills from pharmacies.

Officer George testified that "the cook," a person who manufactured methamphetamine, commonly sent individuals, such as addicts and people financially "down on their luck," to purchase pseudoephedrine. The purchasers brought the pseudoephedrine to the cook, who reimbursed the purchasers with methamphetamine or money. Officer George said that because pseudoephedrine purchasers' names were added to the National Precursor Log Exchange, the method of sending other people to purchase pseudoephedrine protected the cook.

Officer George testified that on March 14, 2013, he was notified that a suspicious pseudoephedrine purchase was occurring at the Shelbyville CVS pharmacy. He and Drug Task Force Assistant Director Tim Miller went to the pharmacy to investigate.

Officer George identified the pseudoephedrine purchaser as Gary Michael Painter. Officer George watched Mr. Painter leave the pharmacy and sit in the front passenger's seat of a white GMC Jimmy SUV. Officer George conducted a records check on the SUV's registration plate and found that the plate was registered to a 1997, red Pontiac sedan. Officer George and Director Miller saw the SUV leave the pharmacy and travel to the Shelbyville Walmart, at which point they lost sight of the SUV.

Officer George testified that when he next saw the SUV, it was unoccupied and parked in front of a Mexican restaurant. Forty-five minutes to one hour later, Officer George observed the Defendant, Mr. Painter, and a woman leave the restaurant, get in the SUV, and drive away. The Defendant drove, Mr. Painter sat in the front passenger's seat, and the woman sat in the back passenger's seat. Officer George said he and Director Miller followed the SUV, hoping to learn whether the three would make any other stops or visit a cook. As the SUV headed toward Tullahoma, Officer George decided to conduct a traffic stop of the SUV based upon the unlawful vehicle registration.

Officer George testified that when he stopped the SUV, the Defendant was the driver. Officer George asked the Defendant for his driver's license, and the Defendant said he did not have one. When asked where he had been that evening, the Defendant did not mention the pharmacy. Officer George checked on the Defendant's license status and determined that it was suspended or revoked.

In an audio-recorded interview, Officer George asked the Defendant about the location of the box of pseudoephedrine, and the Defendant replied the box was "going back to a Billy Mays." Officer George was familiar with Billy or William Mays because Officer George knew he was a methamphetamine cook and had arrested him recently for promotion of methamphetamine manufacture.

Officer George did not remember if the Defendant told him that Mr. Painter had purchased pseudoephedrine that evening, but Officer George knew the identity of the

purchaser because he had access to the pharmacy logs. Officer George said he asked the Defendant where the pseudoephedrine was located in the SUV. The Defendant replied the pseudoephedrine might be in the center console area. Officer George found in the console a box of pseudoephedrine in a CVS shopping bag along with a CVS receipt. Officer George testified that the Defendant said that Mr. Mays planned to use the pseudoephedrine to manufacture methamphetamine and that in return the Defendant would receive about a quarter to one-half gram of finished methamphetamine.

Portions of the recording were played for the jury. In the recording, Officer George asked the Defendant where "the pills" were going, and the Defendant asked if he was "going to get in trouble." Officer George replied the Defendant was in trouble, and the Defendant asked, "Are you going to carry me to jail now?" Officer George replied that it depended upon what the Defendant told him and that if Officer George received "a bunch of lies," he would take everybody to jail. The Defendant asked how he could keep everybody out of jail, and Officer George told the Defendant to tell him the truth. The Defendant said he would do anything if Officer George kept everybody out of jail. As Officer George said he needed to know what the Defendant knew, the Defendant interjected, "Do you know Billy Mays?" Officer George replied he had recently arrested Mr. Mays.

In the recording, the Defendant asked Officer George if Mr. Mays had been arrested recently, and Officer George said yes. As the Defendant began speaking about what he was trying to do, Officer George said, "Let me explain what you are trying to do. You're trying to get a box of pseudoephedrine, you and that gentleman and that woman. . . . And you're trying to take it to [Mr. Mays] so that he can cook meth with it. Correct?" The Defendant ultimately agreed and said he was "trying to make this look good."

In the last portion of the recording that was played, Officer George asked the Defendant what the Defendant would receive from Mr. Mays in exchange for taking the box of pseudoephedrine to Mr. Mays. The Defendant said Mr. Mays would give him "[h]alf a 'G'" to be split among the Defendant and the other two people. The Defendant said that he and the other people might be able to receive "a 'G'" sometimes but that it depended upon how "tight" Mr. Mays was.

The recording was stopped, and Officer George testified that "half a 'G'" and "a 'G'" meant one-half gram of finished methamphetamine and one gram of finished methamphetamine, respectively. He said that the box of pseudoephedrine contained 2.4 "milligrams" of pseudoephedrine and that it would yield about 1.2 grams of methamphetamine.

Officer George testified that after interviewing the Defendant, he interviewed the other two people. Officer George then spoke to the Defendant a second time in the

-3-

presence of Director Miller.  The Defendant verified he was taking the pseudoephedrine to Mr. Mays to receive methamphetamine.

On cross-examination, Officer George testified that Mr. Painter did not exceed the legal limit of pseudoephedrine that could be purchased and that only Mr. Painter went inside CVS.  Officer George said that he did not find pseudoephedrine or methamphetamine on the Defendant's person when they spoke, and the Defendant did tell Officer George that "they" ate at the Mexican restaurant.  Officer George said he did not remember where the Defendant said he was taking Mr. Painter.  Officer George said that after speaking with all of the SUV's occupants, he determined that the woman was not involved in the pseudoephedrine purchase.  Officer George said that other than pseudoephedrine, no other common items used to manufacture methamphetamine were found in the SUV.

On redirect examination, Officer George testified that some common ingredients used to manufacture methamphetamine were not as regulated as pseudoephedrine and were easier to obtain.  He said he determined that only the Defendant knew Mr. Mays.  On recross-examination, Officer George testified that Mr. Painter said he knew the Defendant would give the box of pseudoephedrine to someone to manufacture methamphetamine, but Mr. Painter did not know the identity of the third person.

Drug Task Force Assistant Director Tim Miller, an officer with the Bedford County Sheriff's Department, testified that on March 14, 2013, he and Officer George followed and stopped an SUV containing a person who had made a suspicious pseudoephedrine purchase from CVS.  Although he did not participate in the initial interviews of the SUV's occupants and could not overhear any of the conversations, he was present during the Defendant's second interview.  Director Miller heard the Defendant say that Mr. Painter bought the pseudoephedrine for the Defendant and that the Defendant was taking it to someone named Billy or William Mays in order for the Defendant, Mr. Painter, and the other people involved to receive some methamphetamine.

On cross-examination, Director Miller testified that the Defendant drove the SUV, that Mr. Painter was the front seat passenger, and that the woman and a child were the back seat passengers.  Director Miller did not see the pseudoephedrine but knew that Mr. Painter bought it and that Officer George removed it from the SUV.

The Defendant testified that on the day of the incident, he told Officer George and Director Miller that he was taking the pseudoephedrine purchased by Mr. Painter to Mr. Mays.  The Defendant explained that a couple of months before the incident, the police stopped him for "driving on suspended."  Franklin County Deputy Sam Davidson told the Defendant that if the Defendant helped with an investigation of Mr. Mays, Deputy

-4-

Davidson would issue the Defendant a citation and later drop the charge. The Defendant explained that the reason he gave Officer George Mr. Mays's name was "to get out of a driving charge." The Defendant said he had never met Mr. Mays.

On cross-examination, the Defendant testified that he did not know Mr. Mays or that Officer George was looking for Mr. Mays. The Defendant said he only knew that Mr. Mays manufactured methamphetamine because Deputy Davidson told him.

Regarding the recording, the Defendant agreed that when Officer George asked where the pills were going, he knew Officer George could only be referring to the pseudoephedrine pills. The Defendant said that he did not link the pills to Mr. Mays and that the Defendant was "just bringing up [Mr.] Mays at that time."

The Defendant testified that when he said one G, he did not understand why he would receive one gram if the box of pseudoephedrine only yielded one gram. When asked how he knew Mr. Mays would give him one-half gram if he did not know Mr. Mays, the Defendant said, "I don't know who [Mr.] Mays is."

The Defendant testified that he drove from Winchester to the Mexican restaurant because it was his favorite. He said he only stopped at the restaurant and "the Dollar Store," which was located next to CVS.

The Defendant testified that in the portion of the recording not played to the jury, Officer George first asked if anything was in the SUV and that the Defendant said no. The Defendant said he later learned the pseudoephedrine was in the SUV. He said he did not know what Mr. Painter did with the pseudoephedrine. When asked how he knew to which pills Officer George was referring if he did not know the pills were in the SUV, the Defendant said he did not know.

Upon this evidence, the jury found the Defendant guilty of promotion of methamphetamine manufacture. The trial court sentenced the Defendant to four years. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because he did not purchase pseudoephedrine and because he did not intend to promote the manufacture of methamphetamine. The State argues the jury discredited the Defendant's testimony. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A person is guilty of promoting the manufacture of methamphetamine if he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use[.]" T.C.A. § 39-17-433(a)(1). Delivery "means the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship[.]" *Id*. § 39-17-402(6) (2014).

The record reflects that Mr. Painter purchased pseudoephedrine from the Shelbyville CVS pharmacy on March 14, 2013. Mr. Painter left the pharmacy in an SUV that Officer George stopped for unlawful vehicle registration. The Defendant drove the SUV and admitted he was taking the pseudoephedrine to Mr. Mays for Mr. Mays to use to cook methamphetamine. The Defendant also admitted that he would receive methamphetamine in exchange for delivering the pseudoephedrine to Mr. Mays. The Defendant told Officer George the pseudoephedrine was in the center console of the SUV, and Officer George found the substance in that location. The Defendant said Mr. Painter purchased the pseudoephedrine on the Defendant's behalf.

The Defendant argues that although he told Officer George and Director Miller his plans for the pseudoephedrine, he did not know Mr. Mays or that Officer George was looking for Mr. Mays. The Defendant said he only mentioned Mr. Mays's name to avoid a driving-related charge and was not aware the pseudoephedrine was in the SUV.

As the trier of fact, the jury was free to disregard the Defendant's explanation. In the light most favorable to the State, the Defendant drove Mr. Painter to a pharmacy for him to purchase pseudoephedrine on the Defendant's behalf, and the Defendant told Officer George and Director Miller that the Defendant was taking the substance to Mr. Mays, a well-known methamphetamine cook, in exchange for methamphetamine. *See id.* § 39-17-402(6). The evidence is sufficient to support the conviction, and the Defendant is not entitled to relief on this basis.

## II

## Sentencing

The Defendant contends that his four-year sentence is excessive and contrary to law because it "does not fit the crime or the offender." The State argues the trial court did not abuse its discretion by imposing the maximum sentence because the court considered the appropriate sentencing principles. We agree with the State.

Challenges to within-range sentences regarding the length and manner of service, the application of enhancement and mitigating factors, and the determination of consecutive sentencing are generally reviewed for an abuse of discretion with a presumption of reasonableness. *See State v. Bise*, 380 S.W.3d 682, 706-08 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Relative to the application of enhancement and mitigating factors, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

Relative to the determination of consecutive sentencing, a trial court has broad discretion in determining whether to impose consecutive service. *Pollard*, 432 S.W.3d at

859. A trial court may impose consecutive sentences if it finds by a preponderance of the evidence that one of the criteria is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Relative to the manner of service of a sentence, probation is generally available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C); *see Trotter*, 201 S.W.3d at 654.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the forty-four-year-old Defendant had previous convictions for initiation of a process to manufacture methamphetamine, possession of a Schedule II controlled substance, cruelty to animals, criminal trespassing, possession of less than one-half ounce of marijuana, driving under the influence, and two counts of driving with a revoked license. The first conviction occurred in 1989 when the Defendant was twenty years old, and the most recent occurred in 2014 at age forty-four. At least three of the convictions occurred during periods when the Defendant was serving a sentence on probation.

-8-

The report showed that the Defendant graduated from high school and reported good mental and physical health. He admitted using methamphetamine daily between ages thirty-five and forty-two and drinking alcohol weekly between ages eighteen and forty-three. He had never been in a drug or alcohol treatment program. He was single with three children. He reported self-employment from 1995 to 2013.

During the hearing, the prosecutor noted that on May 28, 2014, the Defendant pleaded guilty to violating his probationary sentence for the initiation of a process to manufacture methamphetamine conviction. The trial court found that the Defendant was a Range I offender based upon his single prior felony conviction. Relative to enhancement factors, the court found that factor (1) applied based upon the Defendant's previous convictions and the twenty-five-year period during which the convictions occurred. *See* T.C.A. § 40-35-114(1) (2014) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court also found that factor (8) applied because the Defendant failed to comply with the conditions for release into the community. *See id*. § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"). The court found that factor (13) applied because at the time of the offense, the Defendant was released on bond and on probation. *See id*. § 40-35-114(13)(A), (C) ("At the time the felony was committed, . . . the defendant [was] [r]eleased on bail or pretrial release, if the defendant is ultimately convicted of the prior . . . felony [or was] [r]eleased on probation[.]"). The court found that if a mitigating factor applied, it would have been factor (1) but that the court did not give the factor "a great deal of weight . . . under [the] circumstances." *See id*. § 40-35-113(1) (2014) ("The defendant's criminal conduct neither caused nor threatened serious bodily injury[.]"). Based upon the enhancement factors, the court sentenced the Defendant to four years.

Relative to consecutive sentencing, the trial court found that the Defendant had an extensive criminal record and that he committed the offense while on probation. *See id*. § 40-35-115(b)(2), (b)(6), (d). The court ordered the Defendant's sentence to be served consecutively to any other existing sentences.

Relative to alternative sentencing, the trial court found that the presumption in favor of alternative sentencing was overcome because the Defendant had "little or no potential for rehabilitation in the absence of extensive incarceration" and because the risk he would commit another crime while on probation was "extremely high." *See id*. § 40-35-103(5). The court noted the Defendant committed crimes while on probation and while released on bail.

The Defendant does not argue the trial court improperly applied the enhancement factors or failed to apply any mitigating factors. He also does not argue the court

improperly ordered consecutive service or improperly denied alternative sentencing. Instead, he argues a four-year sentence is inappropriate under the facts of this case.

The record reflects that the trial court considered the appropriate principles of sentencing, weighed the enhancement and mitigating factors, and imposed a within-range sentence for the Defendant's conviction. The court found, and the record supports, the Defendant's lack of potential for rehabilitation. *See* T.C.A. § 40-35-103(5) ("The . . . lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed."). The Defendant was serving an eight-year suspended sentence for his 2011 initiation of a process to manufacture methamphetamine conviction when he committed the present offense in 2013. Additionally, the Defendant pleaded guilty in 2014 to violating his probationary sentence for the 2011 conviction. The court did not abuse its discretion by sentencing the Defendant to four years and by denying probation, and he is not entitled to relief on this basis.

Relative to consecutive sentencing, the trial court found, and the record supports, that the Defendant had an extensive criminal record and that he committed the offense while on probation. *See id.* § 40-35-115(b)(2), (b)(6). The Defendant's criminal history spans his entire adult life. The Defendant has failed repeatedly when given opportunities to reform his conduct. The court did not abuse its discretion by ordering consecutive sentencing, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-10-